## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of IRHYTHM TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> QUENTIN BLACKFORD, BRUCE G. BODAKEN, KAREN LING, C. NOEL BAIREY MERZ, MARK J. RUBASH, RALPH SNYDERMAN, ABHIJIT Y. TALWALKAR, RENEE BUDIG, KEVIN M. KING, BRICE BOBZIEN, and DOUGLAS J. DEVINE <br><br> Individual Defendants, <br> -and- <br><br> IRHYTHM TECHNOLOGIES, INC, a Delaware corporation, <br><br> Nominal Defendant. | C.A. No. <br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Patrick Ayers ("**Plaintiff**"), by his attorneys, derivatively and on behalf of Nominal Defendant iRhythm Technologies, Inc. ("**iRhythm**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants Quentin Blackford, Bruce G. Bodaken, Karen Ling, C. Noel Bairey Merz, Mark J. Rubash, Ralph Snyderman, Abhijit Y. Talwalkar, Renee Budig, Kevin M. King, Brice Bobzien, and Douglas J. Devine for breaches of their fiduciary duties as directors and/or officers of iRhythm, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on

the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant iRhythm against members of its board of directors (the "**Board**") and members of upper management. The wrongdoing alleged herein has caused substantial damage to iRhythm's reputation, goodwill, and standing in the business community and has exposed iRhythm to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged iRhythm in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by iRhythm's directors and officers from January 11, 2022 through the present (the "**Relevant Period**").

2.      iRhythm is a digital healthcare company that develops and manufactures heart monitoring devices designed to diagnose arrhythmias. Zio AT, one of the Company's primary products, is a heart monitoring device with a transmittal function that reports arrhythmic events to iRhythm's monitoring labs, which then notify the prescribing physician of the arrhythmic event. According to the Company, this allows physicians to diagnose high-risk arrhythmic events in "near real-time." These types of heart monitors, known as mobile cardiac telemetry monitors or "real-time" monitors, are approved for high-risk patients because of their ability to provide these near real-time alerts. Real-time monitors sell for a premium over monitors that do not provide real-time notifications of arrhythmic events.

3.     Throughout the Relevant Period, iRhythm represented to investors that the Zio AT monitor was a real-time monitor intended for use by high-risk patients. The Company's legacy monitor, Zio XT, is a heart monitor intended for non-critical patients, as it does not provide real-time reporting. The Company highlighted the potential for growth of Zio AT, which had only begun to enter the market for real-time monitoring. Particularly given the premium selling price associated with devices approved for use by high-risk patients, investors saw tremendous opportunity in  Zio AT, based upon the Company's representations. As a result of the Company's misrepresentations, as described further below, the price of iRhythm common stock traded at artificially inflated prices throughout the Relevant Period.

4.     The truth began to emerge on November 1, 2022. After the market closed, the Company reported revised fourth quarter and full-year guidance, in part due to "Zio AT utilization." iRhythm's Chief Executive Officer ("**CEO**"), Defendant Quentin Blackford ("**Blackford**"), stated in a conference call with investors that "coming into the fourth quarter, [iRhythm] voluntarily issued a Customer Advisory Notice to [its] Zio AT customers." Consequently, the Company lowered its Zio AT forecast for the quarter from the 40% growth target it had provided for the past three quarters to just 20%. As a result of these disclosures, the price of iRhythm common stock declined by 4.4%, or $5.60 per share, on November 2, 2022. As the market considered this news and multiple analysts cut their price targets, the price of the Company's common stock declined by an additional 11.6%, or $14.07 per share, on November 3, 2023.

5.     On Friday, November 4, 2022, after market close, the Company revealed that, on September 28, 2022, it had issued the Customer Advisory Notice as a result of its assessment of topics raised in an inspection by the United States Food and Drug Administration (the "**FDA**")

focused on Zio AT, after which the FDA issued an inspection observation report on Form 483. A Form 483 is issued in cases where an FDA investigator observes conditions that are deemed violations of the Federal Food, Drug and Cosmetic Act and related acts. Although the Company did not further elaborate on the concerns the FDA raised, it assured investors the Company did "not expect this Zio AT labeling correction or the activities associated with the topics raised in the FDA inspection to present a material risk to [its] business at this time[.]" As a result of these disclosures, the price of the Company's stock declined by 2.4%, or $2.43 per share.

6.      On May 4, 2023, after the market closed for trading, the Company announced that *a month earlier*, the Civil Division of the U.S. Department of Justice ("**DOJ**") served iRhythm with a subpoena requesting the production of documents related to certain of its products and services. Although the Company did not reveal the scope of the DOJ's requests, analysts noted that one of the Company's competitors also received a subpoena from the DOJ regarding its wearable real-time monitoring product, and the analysts thus presumed that the DOJ inquiry was likely related to Zio AT. Analysts also noted "uncertainty" and cited "an overhang" on the Company in light of the DOJ inquiry. As a result of these disclosures, the price of the Company's stock declined by 6.9%, or $9.25 per share.

7.      Finally, on May 30, 2023, after the market closed, iRhythm disclosed that it had received a warning letter from the FDA concerning serious issues with the Zio AT device (the "**Warning Letter**"). Among other things, the Warning Letter criticized the Company's marketing of the Zio AT as a "mobile cardiac telemetry monitor" that provides "near real-time monitoring" and is approved for use in "high-risk patients" as these representations were false. In truth, the Zio AT device was only approved for non-critical patients and suffered from critical flaws that imperiled high-risk patients. For instance, the Company imposed an arbitrary transmission limit

on the number of times the Zio AT could transmit data and failed to communicate this to providers and end-users. Critically, once the transmission limit is met, the patient's data stops being transmitted and, contrary to the Company's representations, the device can no longer be used for its intended purpose and cannot be relied upon by high-risk patients. The Warning Letter outlined other problems with the Zio AT device that the Company had known of since at least 2017 and yet failed to disclose to the FDA, patients, or investors. The disclosures in the Warning Letter caused the price of the Company's common stock to decline by 6.1%, or $7.41 per share.

8.     Throughout the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Zio AT monitoring device. Specifically, the Individual Defendants failed to disclose material, adverse facts pertaining to the Company's Zio AT device, including that: (i) the Company's Zio AT System, as indicated in the FDA's Warning Letter, was "not cleared for the[] indications" for which iRhythm had claimed the device was cleared; (ii) contrary to the representations it made to investors, the Company did not comply with the FDA's marketing regulations and prohibitions against the promotion of products for uncleared and unapproved uses; (iii) the Zio AT monitoring system had failed to show significant arrhythmias, leading to at least two reported deaths; (iv) the Company had received a Warning Letter from the FDA concerning Zio AT's deficiencies, including that the device had only been approved for "long-term monitoring of arrhythmia events for non-critical care patients where real-time monitoring is not needed"; (v) the Zio AT "is only able to transmit 100 patient-triggered and 500 automatically detected arrythmia events" and "[t]hus, when the transmission limit is hit, the device can no longer be used for its intended purpose of transmitting patient ECG for reporting" ; (vi) the Company had not informed physicians "of the existence of a transmission limit, when the transmission limit is reached, or include[d] any information about the action a

physician should take if the devise reached the transmission limit"; and (vii) the Company failed

to inform patients "that a transmission limit exists, no notification [is given] to the patient when

the transmission limit is reached, and no information [is] provided to the patient about what to do

when the transmission limit is reached[,]" leaving them unprotected. The Company failed to report

these critical flaws both to intended users of the Zio AT device and to the market, notwithstanding

that, according to the Warning Letter, iRhythm had been aware of these flaws since at least 2017.

9.       The Individual Defendants breached their fiduciary duties by failing to correct

and/or causing the Company to fail to correct these false and misleading statements and omissions

of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail

to maintain an adequate system of oversight, disclosure controls and procedures, and internal

controls.

10.     As detailed herein, and as alleged in the ongoing federal securities class action in

the Northern District of California styled *Glazing Employers and Glaziers' Union Local #27*

*Pension and Retirement Fund v. iRhythm Technologies, Inc. et al.*, Case No. 3:24-cv-00706 (the

"**Securities Class Action**"), iRhythm's officers and directors substantially damaged the Company

by filing false and misleading statements and omissions and subjecting the Company to

investigation by the DOJ.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the

Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction

over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that would not otherwise have such jurisdiction.

13.     The court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

14.     Venue is proper in this District because the Company is incorporated in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

15.     Plaintiff Patrick Ayers is and has continuously been a stockholder of iRhythm during the wrongdoing complained of herein.

### Nominal Defendant

16.     Defendant iRhythm is a digital healthcare company that develops and manufactures heart monitoring devices designed to diagnose arrhythmia. The Company is a Delaware corporation with its principal executive offices located at 699 8th Street, Suite 600, San Francisco, California 94103. iRhythm's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "IRTC." As of October 23, 2023, iRhythm had over thirty million shares of common stock outstanding, owned by hundreds or thousands of investors.

### Current Director Defendants

17.     Defendant Blackford has served as the Company's CEO and as a director since October 2021. According to the Company's Proxy Statement filed with the SEC on April 12, 2023, Defendant Blackford's 2022 Annual Salary was $650,000, a Bonus of $675,000, Stock Awards of

$5,787,285, and a Non-Equity Incentive Plan Compensation of $829,000 with a total of $7,941,285 in compensation for his role as CEO. For the 2021 Fiscal Year, Defendant Blackford's Annual Salary was $162,500, Stock Awards $9,078,651, and $195 in All Other Compensation with a total of $9,241,346 for his role as CEO. During the Relevant Period, Blackford sold approximately $1,554,000 worth of iRhythm stock on the basis of adverse, material non-public information ("**MNPI**").

18.     Defendant Bruce G. Bodaken ("**Bodaken**") has served as a member of the Board since July 2017. Bodaken also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation and Human Capital Management Committee. For the 2022 Fiscal Year, Defendant Bodaken received $222,704 in total compensation from the Company. This included $65,000 in cash and $157,704 in stock awards.

19.     Defendant Karen Ling ("**Ling**") has served as a member of the Board since November 2021. Ling also served as Chair of the Compensation and Human Capital Management Committee until May 30, 2023. For the 2022 Fiscal Year, Defendant Ling received $141,661 in total compensation from the Company. This included $52,500 in cash, and $89,161 in stock awards.

20.     Defendant C. Noel Bairey Merz ("**Merz**") has served as a member of the Board since April 2018. Merz also serves as a member of the Compensation and Human Capital Management Committee. For the 2022 Fiscal Year, Defendant Merz received $210,204 in total compensation from the Company. This included $52,500 in cash and $157,704 in stock awards. During the Relevant Period, Merz sold approximately $70,000 worth of iRhythm stock on the basis of adverse MNPI.

21.     Defendant Mark J. Rubash ("**Rubash**") has served as a member of the Board since

March 2016. Rubash also serves as Chair of the Audit Committee during the Relevant Period and as a member of the Nominating and Corporate Governance Committee. For the 2022 Fiscal Year, Defendant Rubash received $227,704 in total compensation from the Company. This included $70,000 in cash, and $157,704 in stock awards.

22.     Defendant Ralph Snyderman ("**Snyderman**") has served as a member of the Board since July 2017. Snyderman also served as a member of the Audit Committee during the Relevant Period. For the 2022 Fiscal Year, Defendant Snyderman received $212,704 in total compensation from the Company. This included $55,000 in cash, and $157,704 in stock awards.

23.     Defendant Abhijit Y. Talwalkar ("**Talwalkar**") has served as Chair of the Board since October 2021. Talwalkar also served as a member of the Audit Committee during the Relevant Period until May 30, 2023. He also serves as a member of the Compensation and Human Management Committee and as a member of the Nominating and Corporate Governance Committee. For the 2022 Fiscal Year, Defendant Talwalkar received $270,204 in total compensation from the Company. This included $112,500 in cash, and $157,704 in stock awards.

24.     Collectively, Defendants Blackford, Bodaken, Ling, Merz, Rubash, Snyderman, and Talwalkar may be referred to herein as the "**Current Director Defendants**."

### Former Director Defendants

25.     Defendant Renee Budig ("**Budig**") served as a member of the Board of Directors during the Relevant Period and left her role as a director in May 2023. She was also a member of the Audit Committee during the Relevant Period. For the 2022 Fiscal Year, Defendant Budig received $212,704 in total compensation from the Company. This included $55,000 in cash, and $157,704 in stock awards.

26.     Defendant Kevin M. King ("**King**") served as a member of the Board of Directors during the Relevant Period and resigned from his role on the Board in March 2022. For the 2022

Fiscal Year, Defendant King received $11,250 in cash amounting to his total compensation from the Company. During the Relevant Period, King sold over $900,000 worth of iRhythm stock on the basis of adverse MNPI.

27.     Together, Defendants Budig and King may be referred to herein as the "**Former Director Defendants**."

**Officer Defendants**

28.     Defendant Brice Bobzien ("**Bobzien**") has served as the Company's Chief Financial Officer ("**CFO**") since August 8, 2022. According to the Company's Proxy Statement filed with the SEC on April 12, 2023, Defendant Bobzien's 2022 compensation consisted of an Annual Salary of $153,846, Stock Awards of $3,031,002, Non-Equity Incentive Plan Compensation of $295,200, and $385 other Compensation, totaling $3,480,433 for his role as CFO in 2022.

29.     Defendant Douglas J. Devine ("**Devine**") served as the Company's CFO from June 22, 2020, to August 8, 2022 and as Chief Operating Officer ("**COO**") from December 1, 2021, to March 10, 2023. According to the Company's Proxy Statement filed with the SEC on April 12, 2023, Defendant Devine's 2022 compensation consisted of an Annual Salary of $500,000, Stock Awards of $1,915,024, and Non-Equity Incentive Plan Compensation of $300,000, totaling $2,715,024. For the 2021 Fiscal Year, Defendant Devine's received an Annual Salary of $512,952, Stock Awards of $4,558,007, Non-Equity Incentive Plan Compensation of $605,248, and other Compensation of $3,500 for a total of $5,679,707 for his role as former COO and CFO. During the Relevant Period, Devine sold nearly $2.8 million worth of iRhythm stock on the basis of adverse MNPI.

30.     Together, Defendants Bobzien and Devine may be referred to herein as the "**Officer Defendants**."

31.     Collectively, the Current Director Defendants, the Former Director Defendants, and the Officer Defendants are referred to herein as the "**Individual Defendants**."

32.     The Individual Defendants, because of their positions with iRhythm, possessed the power and authority to control the contents of iRhythm's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and/or misleading.

### Relevant Non-Parties

33.     Mojeh Poul ("**Poul**") has served as a member of the Board since June 2023. Poul also serves as a member of the Audit Committee.

34.     Brian Yoor ("**Yoor**") has served as a member of the Board since June 2023. Yoor also serves as a member of the Audit Committee.

### SUBSTANTIVE ALLEGATIONS

### Background

35.     iRhythm develops and manufactures heart monitoring devices designed to diagnose arrythmias. One of the Company's primary products – which made up over 90% of the Company's revenue until recent years – is a monitoring device called Zio XT, which provides electrocardiogram ("**ECG**") monitoring for up to 14 days. The Company developed Zio XT in 2009 and has firmly established the product as one of the first extended-wear wireless monitors in the ECG market.

{02016571;v1 }                                        11

36.     In 2017, the Company developed Zio AT, a device the Company described as "offer[ing] the full benefits of [its] Zio XT Service, with the addition of real-time data transmission and notification of actionable clinical events." Actionable clinical events include atrial fibrillation, a condition that can cause serious medical problems , including blood clots that can lead to stroke and heart failure. The Zio AT has a cellular transmittal device that provides connectivity between the Zio AT and the proprietary algorithmic software that analyzes the ECG data and detects arrhythmic events for the 14-day wear period. Notably, given its purported capabilities to provide "real-time" notifications of arrhythmic events, the Zio AT device is marketed to high-risk patients as a mobile cardiac telemetry device.

37.     Given that the Company is a medical device provider, it is reimbursed for its services by third-party payors, including commercial insurers and government agencies such as the Centers for Medicare and Medicaid Services. Insurance companies require iRhythm to report the service for which it seeks reimbursement using the Current Procedural Terminology codes, a unified reporting and classification system maintained by the American Medical Association. Each calendar year, the Centers for Medicare and Medicaid Services set the rates they will pay for medical devices and other products. In 2021, the reimbursement rates for Zio XT were reduced from the historical average of $311, by hundreds of dollars in some cases. This reimbursement rate significantly reduced the Company's profits.

38.     Zio AT was not subject to the same reimbursement rate reduction applicable to Zio XT – a 14-day ambulatory cardiac monitoring device that does not provide real-time notification and is intended for non-critical patients. The price premium on real-time monitors is significant. iRhythm reported that for the year 2022, it billed the Zio AT device at an average rate of $1,150, whereas it billed Zio XT device at an average rate of $250.

**The Individual Defendants' False and Misleading Statements**

39.     On January 11, 2022, Defendant Blackford represented iRhythm at the J.P. Morgan Healthcare Conference. During the conference, Blackford touted iRhythm's "best-in-class ZIO platform," including the device's "digital platform," which "enables [patient data] to easily be shared and understood by our physicians, our patients, our payers all through desktop, mobile and [electronic health record] connectivity."

40.     On February 23, 2022, iRhythm announced its financial results for the fourth quarter of 2021. On that same day, iRhythm held an earnings conference call with analysts and investors to discuss the Company's financial results. During that call, Defendant Blackford claimed that "revenues from Zio AT doubled in 2021 versus 2020 and now represents approximately 10% of [iRhythm's] revenues," and attributed this growth to the product's increasing use in the care of higher risk patients. Blackford stated that iRhythm "continue[s] to believe [Zio AT will] grow at a faster rate than the XT business" because while "nearly 25% of the [ambulatory cardiac monitoring] market [is] utilizing Zio XT, maybe no more than 7% or so of market share [is] in the Zio AT opportunity." When asked by an analyst how a 20% increase in reimbursement rates for mobile cardiac telemetry monitors would play into pricing, margin, and volume ramp of Zio AT, Blackford stated that the increase "demonstrate[s] that the value of the product is being realized by" private health care insurers authorized to process Medicare claims. Blackford also added "the value of what you can get off of 14 days in that [real-time monitoring] space versus a traditional 30-day monitor, its superior with our product[.]"

41.     On February 28, 2022, the Company filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "**2021 10-K**"), which was signed by Defendants Blackford and Devine. The 2021 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2022 ("**SOX**") that the filing was free from fraud and was accurate and materially complete. In the 2021

10-K, the Company stated that its "Zio AT mobile cardiac telemetry monitor . . . offers what our Zio XT offers plus the additional capability of transmission during the wear period to assist physicians in diagnosing and treating the small percentage of the population requiring more timely action." The Company further stated that its "Zio AT service delivers the same comprehensive final report [as Zio XT], but also provides physicians with actionable notifications" and highlighted that "Zio AT improves the speed and accuracy of diagnosis relative to traditional mobile cardiac telemetry . . . devices and services."

42.    iRhythm also announced in that statement that it had "received FDA clearance for [its] Zio AT ECG Monitoring System, [] which is designed to provide timely transmission of data during the wear period." Moreover, the Company acknowledged that "[t]he FDA and the Federal Trade Commission ('FTC') . . . regulate the advertising and promotion of [its] products and services to ensure that the claims [iRhythm] make[s] are consistent with [its] regulatory clearances." According to the 2021 10-K, iRhythm is required to follow the "labeling regulations and FDA prohibitions against the promotion of products for un-cleared, unapproved or off-label uses." Significantly, the Company acknowledged that "[m]aterial modifications to the Zio monitors, labelling of the Zio monitors, or Zio service," which include changing the products' addressable market "may require new [FDA] clearances" and may additionally require "premarket approvals or may require [iRhythm] to recall or cease marketing [its] products and services until clearances are obtained."

43.    The 2021 10-K also included a statement from the Company that it followed "medical device reporting ('MDR') regulations, which require that manufacturers report to the FDA if their device may have caused or contributed to a death or serious injury[.]"

44.    On June 8, 2022, Defendant Blackford participated in the William Blair Growth

Stock Conference on behalf of iRhythm. During the conference, Blackford stated, "[T]here's really two products in the portfolio today. There's our Zio XT product, which is for a lower risk profile of a patient . . . . The other product that [iRhythm] launched just about a year and a half ago is our Zio AT product. This really plays in the [mobile cardiac telemetry monitor] space." Blackford noted that while Zio AT represented "less than 5% of the overall business," he believed "in time it'll represent a portion of the market that's very comparable to our XT product," which "represents 95% of the business today."

45.     On August 4, 2022, iRhythm issued a press release announcing its financial results for the second quarter of 2022 (the "**2Q22 Release**"). In the 2Q22 Release, which was also filed with the SEC on Form 8-K, the Company raised its full year 2022 revenue guidance to between $415 million and $420 million, representing 29% to 30% growth over prior year results. The Company stated that the increase in the second quarter was "primarily driven by Zio XT and AT volume growth and increases in Medicare pricing."

46.     Later that same day, the Company held an earnings conference call with analysts and investors to discuss the Company's financial results. During that call, Defendant Blackford assured investors about the growth opportunity for Zio AT in the real-time monitoring space, stating, "[t]oday, we hold . . . probably around 7% [of the market share] when we think about the [mobile cardiac telemetry monitoring] space or where Zio AT really can play" and assured investors that there is "opportunity that sits there from a product perspective."

47.     On August 11, 2022, Defendant Devine participated in the Canaccord Growth Conference on behalf of iRhythm. During the conference, Devine said, "in the standard 14-day monitoring, we are the overwhelming share leader" and elaborated that, in the real-time monitoring space, iRhythm is "the third player in what is a little bit more well-developed [market].

48.     On September 21, 2022, iRhythm held its annual Investor Day conference. During the conference, Defendant Bobzien offered that the average sales price for the Zio AT, using the CMS reimbursement rate as a proxy, was "about $1,150," and by comparison, the rate for Zio XT was "$250 over the planning horizon." Bobzien also emphasized the opportunity for growth with the addressable market expansion of the Zio AT platform.

49.     The statements above were materially false, misleading, and failed to disclose material facts necessary to make the statements not false and misleading in light of the circumstances in which they were made. As detailed in the Warning Letter, "based on [iRhythm's] marketing materials, website, and other documentation," investors were led to believe that "the Zio AT System is intended for 'near real-time monitoring' and high-risk patients,' even though the Zio AT System is not cleared for these indications." Contrary to the representations it made to investors, iRhythm failed to comply with the FDA's marketing regulations and prohibitions against the promotion of products for uncleared and unapproved uses. Indeed, the Warning Letter noted that the Zio AT device is in "nonconformance because the device is unable to transmit ECG information for monitoring and **is not remotely capable of delivering near-real-time monitoring for high-risk patients.**" This is because the Company imposed a transmission limit on the number of arrhythmic events that triggered a notification to the prescribing physician, which resulted in harm to patients who reached the transmission limit during the wear period and whose arrhythmic events were not reported to physicians. For example, the Warning Letter details that the Zio AT monitor failed to report significant arrhythmias leading to at least two reported deaths. Furthermore, the Company failed to report these adverse events and other missed arrhythmic events to the FDA, in violation of the reporting requirements of Medical Device Reporting regulations.

**The Truth Begins to Emerge**

50.     On November 1, 2022, after market close, the Company issued a press release announcing revised guidance for its fourth quarter and full year 2022 (the "**FY 2022 Release**"). In the FY 2022 Release, which was also filed on Form 8-K filed with the SEC, the Company provided revised guidance for 2022 of between $407 million and $411 million, one quarter after the Company had increased guidance to between $415 million and $420 million. The Company attributed "softness in returned devices" and "Zio AT utilization" as challenges that will "persist[] into the fourth quarter" and "have led us to reduc[e] our full year revenue guidance."

51.     Later that same day, the Company held an earnings conference call with analysts and investors to discuss the Company's financial results. During the call, Defendant Blackford explained that the Company reduced the revenue outlook for the full year in part because it had "voluntarily issued a Customer Advisory Notice to [its] Zio AT customers" and had "seen reduced growth with Zio AT within the fourth quarter-to-date." Blackford further announced that "[w]ith the Customer Advisory Notice" the Company "adjusted [its] Zio AT forecast for the quarter to grow closer to approximately 20%, which is a step down from the upper 40% growth [it] had seen through the first nine months of the year."

52.     As a result of these disclosures, the price of the Company's common stock declined by 4.4%, or $5.60 per share, from a closing price of $126.77 on November 1, 2022 to a closing price of $121.17 on November 2, 2022. As the market digested this news and multiple analysts cut their price targets, the price of the Company's common stock declined by an additional 11.6%, or $14.07 per share, to close at $107.10 per share on November 3, 2022.

53.     During the November 3, 2022 conference call, however, Defendant Blackford assured investors that the Company would continue to grow the Zio AT platform in the real-time

monitoring market. He stated, "[w]e look forward to enhancing our Zio AT product to grow our market share in the [mobile cardiac telemetry monitoring] space." Blackford addressed investors' concerns by calling the slower growth "more of a near-term impact" and explaining that "once we get the packaging updated, the labelling updated, the field action notice starts to subside, I don't think it becomes nearly as big of a headwind." Blackford highlighted that "you're going to see us continue to innovate on the Zio AT side" and "continue[] to close some of the competitive gaps, and I think position[] us really well for growth in that [mobile cardiac telemetry monitoring] space."

54. The statements above were materially false and misleading because the Company knew that the issues it faced with Zio AT's transmission limit were not a "near-term" headwind. As noted in the Warning Letter, for example, the Company knew that it faced severe scrutiny from the FDA regarding the transmission limit and its failure to disclose the limit to end users and physicians. Moreover, since the device was never approved for real-time reporting on a high-risk patient population, the Company knew that there was no reason to expect the continued product growth in the mobile cardiac telemetry monitoring market that it had promised investors.

55. On November 4, 2022, after market close, the Company filed its Form 10-Q with the SEC for the third quarter of 2022 ("**3Q22 10-Q**"). In the 3Q22 10-Q, the Company revealed additional details regarding the Customer Advisory Notice. Specifically, the Company disclosed that it had initiated the Customer Advisory Notice on September 28, 2022, following issues raised by the FDA during an inspection focused on Zio AT and discussions following the Company's Form 483 responses. The Customer Advisory Notice, according to the 3Q22 10-Q, warned patients of a "labeling correction" related to "the device's maximum transmission limits during wear," as well as other critical issues that prevented the device from working as advertised. iRhythm stated

that it "reported this Customer Advisory Notice and related information to the FDA under 21 C.F.R., Part 806, and [was] in ongoing communication with the FDA on this matter."

56.     As a result of these disclosures, the price of iRhythm common stock dropped by nearly 2.4%, or $2.43 per share, from a price of $102.87 on November 4, 2022, to a closing price of $100.44 on November 7, 2022.

57.     Nevertheless, in the 3Q22 10-Q, the Company tried to relieve investor concerns by stating, "we do not expect this Zio AT labeling correction or the activities associated with the topics raised in the FDA inspection to present a material risk to our business at this time."

58.     On February 23, 2023, after the market closed, the Company announced its financial results for the fourth quarter and the 2022 Fiscal Year. Later that day, the Company held an earnings call with analysts and investors to discuss its financial results. During the call, Defendant Blackford stated, "[t]here is significant runway ahead of us in the [mobile cardiac telemetry monitoring] market where we have less than 10% market share today." He added, "[w]e are excited about this next generation of our Zio AT product, which we believe will better position us to compete in the space and drive market share gains into the future." In response to an analyst question regarding the growth of Zio AT in view of the Customer Advisory Notice, Blackford stated, "that business is going to grow right around 30% for us . . . we certainly have seen a difference in that growth profile coming out of that field advisory notice. Now we've made all the updates in the labeling that we need to do and in the packaging that we need to do."

59.     The statements above were materially false and misleading because the Company had failed to take sufficient measures to remediate the concerns the FDA raised in Form 483 communications. Since the Zio AT device was never approved for real-time reporting on a high-risk patient population, representations to investors that it was on track to grow the product in the

mobile cardiac telemetry monitoring market were false.

60.    On May 4, 2023, the Company filed its Form 10-Q with the SEC for the first quarter of 2023 (the "**1Q23 10-Q**"). In the 1Q23 10-Q, the Company announced that "on April 4, 2023, [it] received a Subpoena Duces Tecum from the Consumer Protection Branch, Civil Division of the United States Department of Justice, requesting production of various documents regarding [its] products and services."

61.    This news caused the price of the Company's stock to decline by 6.9%, or $9.25 per share, from a price of $134.04 on May 4, 2023, to a closing price of $124.79 on May 5, 2023.

62.    Although the Company refrained from providing additional detail about the DOJ's request, in a May 5, 2023 report, J.P. Morgan analysts noted that one of the Company's competitors, Boston Scientific, had also disclosed that it had received a subpoena from the DOJ relating to its real-time monitoring product. This indicated to the analysts that the DOJ investigation into iRhythm was related to the Zio AT. The analysts also noted that while "the Consumer Protection Branch is part of the Civil Division of the DOJ and has a very broad mandate," the agency's "affirmative litigation is often used to recoup losses to fraud and abuse of federal funds" and the closest precedent in the industry is a recent settlement with the Biotelemetry "to resolve claims of improper billing and usage of offshore technicians . . . for federal healthcare beneficiaries" related to its telemetry device. In the report, analysts noted an "overhang until [investors] get further details into the nature of the investigation."

**The Truth Fully Emerges**

63.    On May 30, 2023, after market close, the Company filed a form 8-K with the SEC, which disclosed that it had received a Warning Letter from the FDA resulting "from the inspection of the Company's facility located in Cypress, California that concluded in August 2022" and

alleging "non-conformities to regulations for medical devices, including medical device reporting requirements, relating to the Company's Zio AT System and medical devise quality system requirements."

64. The Warning Letter – a notice that is only issued when "a manufacturer has significantly violated FDA regulations" – addressed a series of deficiencies tied to the marketing for and capabilities of the Zio AT device. In particular, the FDA noted that the Company had falsely marketed the Zio AT as approved for use in high-risk patients who require real-time cardiac monitoring. In truth, Zio AT is only approved for "long-term monitoring of arrhythmia events for non-critical care patients where real-time monitoring is not needed." Accordingly, the Warning Letter states that the Company is required to submit a new 510(k)[1] because the Company's "labeling describes a new patient population" which "affect[s] the safety or effectiveness of the device."

65. The Warning Letter revealed that the Company was putting patients at risk given that the Zio AT device suffered from critical flaws that were known to iRhythm since at least 2017 – but never disclosed to patients, physicians, or the FDA. Most significantly, "the device is only able to transmit 100 patient-triggered and 500 automatically detected arrhythmia events" and "[t]hus, when the transmission limit is hit, the device can no longer be used for its intended purpose of transmitting patient ECG for reporting." Moreover, the Warning Letter detailed that iRhythm failed to inform physicians "of the existence of a transmission limit, when the transmission limit is reached, or include any information about the action a physician should take if the devise reached the transmission limit." Likewise, the Company provided no information to patients "that a

---

[1] Section 510(k) of the Food, Drug and Cosmetic Act requires device manufacturers who must register to notify the FDA of their intent to market a medical device at least 90 days in advance. This is known as Premarket Notification ("**PMN**") or 510(k).

transmission limit exists, no notification to the patient when the transmission limit is reached, and no information provided to the patient about what to do when the transmission limit is reached." Therefore, patients who relied on the device to report heart irregularities were unknowingly left unprotected.

66.    Significantly, the transmission limitation prevents the Zio AT system from functioning as a mobile cardiac telemetry monitor that is intended for high-risk patients. The Warning Letter criticized the Company for violating its Quality Systems Regulations, stating "[w]hen the transmission limit is exceeded" the Zio AT is in "nonconformance because the device is unable to transmit ECG information for monitoring and is **not remotely capable of delivering near-real time for monitoring for high-risk patients.**"

67.    The Warning Letter also highlighted that the Company failed to report adverse events related to Zio AT as required by FDA regulations. Specifically, the Company failed to report complaints describing events where "the transmission limit was reached prior to occurrence of a significant arrythmia," including two deaths that occurred when the device stopped transmitting the ECG data to the prescribing physician and the physician did not receive notice of the arrythmia "until the final wear-period report was generated."

68.    These disclosures resulted in the price of the Company's common stock declining by 6.1%, or $7.41 per share, from a price of $121.68 on Mary 30, 2023, to a new closing price of $114.27 on May 31, 2023.

## FIDUCIARY DUTIES

69.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe iRhythm and its stockholders fiduciary obligations of trust, loyalty, good faith, and good care and was/is required to use his/her utmost ability to control and manage iRhythm in a fair, just, honest, and equitable manner. The Individual

Defendants were/are required to act in furtherance of the best interests of iRhythm and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

70.     Each Individual Defendant owed and continues to owe iRhythm and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of iRhythm, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with iRhythm, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financial, financial prospects, compliance practices, and internal controls so that the price of the Company's stock would be based on truthful and accurate information.

72.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements – including requirements involving the filing of the accurate financial and operational information with the SEC – and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware and the United States and pursuant to iRhythm's own Code of Conduct;

(c)     Conduct the affairs of the company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how iRhythm conducted its operations and, upon receipt of notice of information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as a necessary to comply applicable laws;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of iRhythm, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that iRhythm's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above; and

(i)      Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

73.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by iRhythm.

74.    At all times relevant hereto, the Individual Defendants were the agents of each other and of iRhythm and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

75.    The Individual Defendants, as officers and/or directors of iRhythm, were bound by the Company's Code of Business Conduct and Ethics[2] ("**Code of Conduct**"), which provides:

> As we focus upon our mission—to set a new standard for how cardiac arrhythmias are diagnosed and aspire to be the world leader in the management of cardiac arrhythmia information—it is important for us to remember that we must always do things the iRhythm way. That is, each of us plays an integral role in ensuring that our Company embodies our key values: Respect, Passion, Bold, Boundaryless, and Balance. It is our commitment to one another, our shareholders, our community, and most importantly, our patients that causes us to adhere to the highest standards of integrity and remain true to our values in all aspects of our daily conduct. By doing so, we will maintain the trust that these partners place in us to provide quality care and to develop transformative methods of diagnosing cardiac arrhythmias.
>
> Our Code of Conduct is our guidebook to understanding what is expected of us as members of the iRhythm team—it is our primary resource as we face difficult decisions or ethical issues that may arise as we interact with others in our day-to-day business activities.

---

[2] *See* iRhythm Technologies, Inc. Code of Business Conduct and Ethics (Dec. 15, 2022), https://s201.q4cdn.com/653785554/files/doc_downloads/governance_docs/irtc-code-of-conduct-updated-12-15-22.pdf.

> Of course, while the Code cannot address every specific situation we may experience, it is based in common sense. Listening to one another, speaking up, and holding ourselves and each other accountable to the highest standards of personal integrity are all simple things that we can do to ensure that we are living our values and remaining true to our mission.

76.    A section of the Code of Conduct titled "Respecting our Values" states the following:

> At iRhythm, honest and ethical conduct is critical to our success as a business. All iRhythm employees, directors, agents, and contractors have a responsibility to comply with laws that apply to iRhythm and be honest and ethical in all Company dealings.

> Our Code of Conduct (the "Code") has been developed to provide you with the guidance and access to resources needed to operate with unquestionable integrity. The Code is designed to deter wrongdoing and to promote: Honest and ethical conduct; Compliance with applicable laws, rules, and regulations; Prompt internal reporting of violations of the Code; Accountability for adherence to the Code; and Full, fair, accurate, timely and understandable disclosure in our reports and public communications.

> Our Code applies to all employees and members of our Board of Directors. Each of us has the obligation to read and understand the Code. iRhythm also engages consultants, contractors, and other third-parties to perform services for the Company; these individuals are also expected to read, understand and abide by the Code.

> * * *

> As an iRhythm employee or contracted third party, you're expected to: Read, understand, and adhere to this Code, as well as the laws, regulations, and policies that apply to your job; Ask questions, and seek guidance when unsure how to handle any business situation; Report any violations of this Code immediately. . . ; Cooperate truthfully with investigations; Never retaliate against another employee for raising a question or reporting what he or she believes is a violation of the Code, Company policies, or the law; and Always act with honesty and integrity.

> All iRhythm employees are held to the same compliance and ethical standards, regardless of their position in the Company. Individuals in management and/or leadership positions are expected to go one

step further to encourage a strong compliance "tone at the top." Managers, supervisors, and leaders should also: Help employees understand how the Code, Company policies, and applicable laws and regulations apply specifically to their jobs; Create and environment where employees feel comfortable discussing compliance questions or concerns; Consider ethical and compliance conduct when evaluating employee performance; and Push forward the discussion of compliance as a regular part of conversation at the Company.

\* \* \*

Managers are required to take all employee concerns seriously and create and environment where employees feel comfortable discussing questions and issues. Managers must handle all reported concerns with discretion and escalate acts of misconduct or wrongdoing upon learning of information that could: Be potentially criminal in nature; Become the subject of a government or regulatory agency inquiry; Expose colleagues, patients, or the public to dangerous health or safety risks; or have potential financial, legal, operations, or reputational consequences.

77.     Under the "Respecting our Values" section of the Code of Conduct, a subsection of

"Our Commitment to the Truth" states the following:

At iRhythm, we take all allegations of misconduct seriously and, where there is sufficient information provided, will investigate every report of potential violations of the Code, Company policy, or the law. As an iRhythm employee, you are required to cooperate with any and all Company investigations when asked, and, in the spirit of ethical decision making, you must provide complete and truthful information in the process. You are also expected to keep any investigation and related discussion that you're involved in confidential.

78.     Under the "Respecting our Values" section of the Code of Conduct, a subsection

titled "Reporting Honestly" states the following:

Reporting known or suspected acts of misconduct in good faith is an obligation we all share. Reports submitted in bad faith are also a violation of the Code and subject to disciplinary action.

Violations of this Code are serious offenses carrying individual consequences. These consequences depend on the violation at-hand

and may include but are not limited to: Disciplinary actions including and up to termination of employment; Prosecution; Loss of iRhythm business; Fines or imprisonment; and Damage to personal reputation.

Violations of this Code may also directly impact our patients, as misconduct could compromise product safety, pose environmental risk, raise the cost of our products, hurt our shareholders, and result in decreased trust in the iRhythm brand.

79.     Under the "Respecting our Values" section of the Code of Conduct, a subsection titled "Ensuring the Safety and Quality of Our Products" states the following:

iRhythm defines the optimum level of quality as one that reliably meets the expectations of our customers, patients, and regulatory while maintaining an effective Quality Management Systems and maximizing competitive advantage and shareholder value. Our Quality Policy is core to deliver a quality service, focus on patient safety, and maintain transparency with regulatory Medical Device Reporting to the appropriate regulatory agencies.

Quality Policy

At iRhythm Technologies, the patient is at the heart of everything we do. Each of us has the responsibility to contribute to quality through collaboration, innovation, and passion.

We incorporate everything we do by: Operating with integrity and in compliance with applicable laws and regulations[;] Continuously improving our products, processes, and services[; and] Identifying and preventing issues before they arise[.]

80.     Under the "Respecting our Shareholders" section of the Code of Conduct, a subsection titled "Conflicts of Interest" states the following:

Your decisions and actions in the course of your employment with the Company should be based on the best interests of the Company and not based on personal relationships or benefits.

* * *

Avoid any financial interest that may conflict with your responsibilities to the Company or make it difficult to make objective decisions in your day-to-day activities.

* * *

Never use your position at iRhythm – or any knowledge, resources, or information you learned through your position at iRhythm – for personal gain or to take advantage of any opportunities that the Company may have an interest in.

Loans from the Company to directors and executive officers are prohibited. Loans from the Company must be approved in advance by the Board or its designated committee.

You may serve in an elected or appointed public office if that position does not create or appear to create a Conflict of Interest, provided that you obtain approval from the Ethics & Compliance Services Department prior to engaging in that activity.

* * *

iRhythm permits members of the same family to work at the Company subject to the restrictions below: Direct or indirect reporting relationships between Family Members are prohibited. Family Relationships with suppliers, vendors, service providers or customers with whom the employee interacts for their job at iRhythm are prohibited. Family Members of the CEO, all CEO direct reports, and Board, regardless of whether a reporting relationship exists, will be prohibited from working at iRhythm.

The following restrictions on Romantic Relationships apply: Romantic Relationships between employees in a direct or indirect supervisory relationship are prohibited. . . Individuals who are VP and above having a Romantic Relationship with any iRhythm employee . . . Romantic Relationships with suppliers, vendors, service providers or customers with whom and employee interacts for their job at iRhythm are prohibited. . . iRhythm prohibits the CEO, all CEO direct reports, and Board from engaging in Romantic Relationships with any iRhythm employee, regardless of whether they work together in a director or indirect supervisory relationship.

Other Personal Relationships (such as creditor relationships, landlord/tenant relationships or other financial relationships) can create potential conflicts of interest with respect to hiring (or engagement), management, assignment of work, and compensation (or pricing), to name just a few areas of concern. The CEO, all CEO direct reports, Board, and Individuals in Other Personal Relationships that may pose potential conflicts of interest must

disclose the relationship to Human Resources. Employees who are not sure whether there is a conflict of interest should disclose the relationship.

\* \* \*

Employees who violate this policy, whether by engaging in a prohibited relationship or failing to disclose a covered relationship, will be subject to discipline, up to and including termination, consistent with applicable law.

81. Under the "Respecting our Shareholders" section of the Code of Conduct, a subsection titled "Investor and Media Communications" states the following:

As a publicly traded company, iRhythm must follow specific rules about how and when to provide reports to the public and government regarding its business and financials.

\* \* \*

Our Chief Executive Officer, Chief Financial Officer, Chief Operating Officer and Investor Relations personnel and their authorized designees are our official spokespeople for financial matters.

\* \* \*

If you are one of the authorized individuals, you are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely, and understandable answers to inquiries related to the Company's public disclosures. All communications made to public audiences on behalf of the Company, including formal communications and presentations made to investors, customers, or the press, require prior approval.

82. Under the "Respecting our Shareholders" section of the Code of Conduct, a subsection titled "Financial Reporting" states the following:

As a public company, we are required to follow strict accounting principles and standards to report financial information accurately and completely, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with applicable laws. The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our fellow team members, partners, and shareholders.

We are committed to providing fair, accurate, and timely disclosure of financial information because financial reporting requires the highest standard of fairness and honesty.

We all have a duty to ensure our financial integrity by: Ensuring all transactions are properly authorized and recorded accurately and in a timely manner[;] Protecting Company assets[; and] Submitting for reimbursement valid business expenses only[.]

* * *

Dishonest financial reporting can result in harm to our reputation, our shareholders, and our business. It can also result in civil or criminal penalties for both the individual and the Company. Reporting false or misleading information in any type of internal or external financial report is forbidden.

83.     Under the "Respecting our Shareholders" section of the Code of Conduct, a subsection titled "Use of Company Resources" states the following:

We are all responsible for the appropriate use and protection of our resources. By effectively maintaining and protecting our assets, we can add greater value to the lives of our patients. Do not remove Company resources from our facilities, other than equipment you routinely use as part of off-site job responsibilities that have been authorized by your supervisor[.] Do not use Company resources for outside businesses or unethical activities[.]

84.     Under the "Respecting our Shareholders" section of the Code of Conduct, a subsection titled "Intellectual Property and Confidential Information" states the following:

iRhythm's business is built upon great ideas – ideas that we bring to the market and improve upon over time. Protecting our ideas is vital to our continued success as a company, so it is important that we recognize what our ideas are, and how to safeguard them from theft, loss, or unauthorized copycat activity in the market. Our Intellectual Property includes: Our branding and marketing activities, including iRhythm and product names and logos[;] The technology behind our products and service offerings[;] Drawings, books and other representations of our products and their components[; and] Patents and trademarks that we have obtained with regulatory agencies.

Our Intellectual Property and Confidential Information is what drives our innovation. If this information were to fall into the wrong

hands, our business could be harmed. We all have a responsibility to protect this information and our intellectual property. Consistent with our dedication to Respect as a key value at iRhythm, we must also protect the intellectual property that belongs to others. Do not disclose any confidential business information or intellectual property to anyone outside the Company, even to members of your family, unless you are authorized to do so by your supervisor. Be cautious discussing Company business in public, including in elevators, airplanes, and restaurants. Do not use your laptop in a place where someone can see your screen, like a coffee shop or airplane. Respect the confidential information and intellectual property of others, including competitors and partners—this includes honoring any confidentiality agreements the Company enters into. Seek guidance from Legal if you have any questions about the proper use of confidential information or intellectual property, or if you are concerned that it is being misused in any way.

85.     Under the "Respecting our Shareholders" section of the Code of Conduct, a

subsection titled "Prohibition on Insider Trading" states the following:

Your job responsibilities at iRhythm may mean that you learn important Company information that the public hasn't heard of yet. Disclosing information such as mergers and acquisitions, new products or product recalls, or the Company's quarterly earnings before made public, could hurt our competitive position and our shareholders. Using this information for your own personal benefit or passing it on to someone else who might use it is illegal and can result in discipline as well as civil and criminal penalties.

Do not buy or sell securities of iRhythm, or any other company, while in possession of non-public, insider information[;] Refer any questions from investors, analysts, and the media to Legal [; or] Ask Legal if you have any questions about whether it is appropriate to buy or sell iRhythm stock.

86.     Under the "Respecting our Shareholders" section of the Code of Conduct, a

subsection titled "Record Retention" states the following:

We have a responsibility to manage and maintain or Company records for as long as required by law. This means that we must: Never receive, request, or share internally or externally, any patient information, except as permitted by our HIPAA Privacy policy. Keep documents and records we create or receive. Follow any instructions you may receive from Legal to retain documents, such

as required holds in litigation, government investigations, and audits. Never hide or destroy records to avoid disclosure in legal or government proceedings[.]

87.     The "Respecting our Partners" section of the Code of Conduct states the following:

Consistent with our dedication to Respect as a key value at iRhythm, we believe that fair dealing, honesty, and trustworthiness are necessary to build relationships that benefit our patients. Further, as a digital health care company, we are subject to global laws and regulations that inform how we can do business.

88.     Under the "Respecting the Law" section of the Code of Conduct, a subsection titled "Fraud, Waste and Abuse Laws" states the following:

iRhythm participates in a number of federal programs with specific fraud, waste and abuse requirements.

* * *

iRhythm requires all employees to be compliant with fraud, waste and abuse laws. Penalties for failing to comply include, but are not limited, to the following: Disciplinary action up to, and including, termination where appropriate; Criminal convictions or fines (individually and the corporate level); Loss of licensure/sanctions; and Exclusion from participating in federal healthcare programs[.]

89.     Under the "Respecting the Law" section of the Code of Conduct, a subsection titled "Anti-Kickback Laws" states "[w]e promptly comply with applicable federal and state anti-kickback laws and regulations."

90.     Under the "Respecting the Law" section of the Code of Conduct, a subsection titled "Sarbanes-Oxley Act of 2002" states the following:

iRhythm complies with the federal Sarbanes-Oxley Act of 2022, which protects investors by providing reasonable assurance regarding prevention or timely detection of fraudulent accounting and financial practices at publicly-traded companies. iRhythm commits to full, fair, accurate, timely, and understandable disclosures in reports and documents by filing regular reports with the Securities and Exchange Commission (SEC). Our leaders certify or sub-certify for the accuracy of information provided within each report. iRhythm also audits our internal controls to assess

effectiveness while identifying potential gaps. Significant gaps or deficiencies identified are disclosed to the Audit Committee and in filings if material weakness is present. iRhythm contracts with external auditors to ensure our internal controls assessment was fairly and accurately conducted.

91.     Under the "Respecting the Law" section of the Code of Conduct, a subsection titled

"Medical Device Laws" states the following:

> Our devices are regulated by governmental agencies, health ministries, and other regulatory authorities around the world. Regulatory requirements include marketing approvals, product registrations, clinical study parameters, good manufacturing practices, design controls and labeling and advertising controls, among others. We all have a responsibility to understand and comply with these requirements and to contact, as applicable, Legal, Quality and Regulatory, or the Ethics & Compliance Services Department for guidance or to report any acts that violate regulations.
>
> At iRhythm, we interact with a broad assortment of regulators, some of which include: The FDA's Quality System Registration, The European Union's Medical Device Directive, The Department of Justice, The U.S. Securities and Exchange Commission, and the Department of Health and Human Services Office of the Inspector General.
>
> We are committed to always showing the utmost respect for the regulatory agencies we interact with. Successful interactions with our regulators begin with following all laws and regulatory requirements applicable to our business.

92.     Under the "Respecting the Law" section of the Code of Conduct, a subsection titled

"Anti-Bribery and Anti-Corruption Laws" states the following:

> Whether you are located in the United States or abroad, you are also responsible for fully complying with the Foreign Corrupt Practices Act (FCPA) and other similar anti-corruption laws that apply to our global business. The FCPA makes it illegal to offer, pay promise to pay, or authorize to pay any money gift, or other item of value to any foreign official, political party, or candidate to assist the Company or another to obtain or retain business. The FCPA also forbids doing indirectly, such as through an agent, reseller, or consultant, what would be illegal to do directly. All managers and

supervisors are expected to monitor continued compliance with the FCPA.

**Duties Pursuant to the Audit Committee Charter**

93.      In addition to the duties set forth in the Code of Conduct, Defendants Budig, Rubash, Snyderman, and Talwalkar (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to iRhythm under the Charter of the Audit Committee of the Board of Directors of iRhythm Technologies, Inc.[3] (the "**Audit Committee Charter**"), as set forth in part below.

94.      Specifically, the Audit Committee Charter noted that the purpose of the Audit Committee is to "assist the Board of Directors . . . in fulfilling its responsibilities for generally overseeing:"

> The Corporation's accounting and financial reporting processes and internal controls over financial reporting, as well as the audit and integrity of the Corporation's financial statements.
>
> The qualifications, independence and performance of the Corporation's registered public accounting firm.
>
> The design, implementation and performance of the Corporation's internal audit function, if any.
>
> The Corporation's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
>
> All matters related to the security of and risks related to computerized information and technology systems across the Corporation as well as by product (including privacy, data security, and cybersecurity matters).
>
> Risk assessment and risk management program, policies and procedures.

---

[3] *See* Charter of the Audit Committee of the Board of Directors of iRhythm Technologies, Inc. https://s201.q4cdn.com/653785554/files/doc_downloads/committee_charters/iRhythm-Audit-Committee-Charter-(November-2021).-(4812-5152-4596.3).pdf.

95.    The Audit Committee Charter also states that "[t]he Audit Committee is …
responsible for preparing the report required by the Securities and Exchange Commission (the
'SEC') rules to be included in the Corporation's proxy statement for the annual meeting of
shareholders, and for performing other duties and responsibilities as are enumerated in or
consistent with this charter."

96.    Additional responsibilities included in the Audit Committee Charter are:

> Select[ing] and Hir[ing] the Independent Auditor. The Audit
> Committee shall be directly responsible for appointing,
> compensating, retaining overseeing and, where appropriate,
> replacing the independent auditor. The independent auditor will
> report directly to the Audit Committee. The Audit Committee shall
> have sole authority to approve the hiring and discharging of the
> independent auditor, all audit engagement fees and terms and all
> permissible non-audit engagements with the independent auditor.
> The Audit Committee, shall, at least annually, receive and audit
> engagement letter and either execute it on behalf of the Corporation,
> or, if the Audit Committee or its Chairperson are not appropriate
> parties to sign the letter, acknowledge the letter and agreement to
> the terms of engagement. The Audit Committee shall also appoint,
> retain, compensate, oversee and, where appropriate replace any
> other registered public accounting firm engaged for the purpose of
> preparing or issuing and audit report or performing other audit,
> review or attest services for the Corporation.
>
> Supervise and Evaluate the Independent Auditor. The Committee
> Shall: Oversee and, at least annually, evaluate the work of the
> independent auditor or any other registered public accounting firm
> engaged for the purpose of preparing or issuing an audit report or
> performing other audit, review or attest services for the Corporation,
> which evaluation shall include a review and evaluation of the lead
> partner and senior members of the independent auditor team. The
> Audit Committee shall review, in consultation with the independent
> auditor, the annual audit plan and scope of audit services and
> monitor such plan's progress.
>
> Review and resolve any disagreements that may arise between
> management and the independent auditor regarding internal control
> over financial reporting or financial reporting.
>
> At least annually, obtain and review a report by the independent

auditor that describes (i) the independent auditor's internal quality-control procedures, and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding any independent audit performed by the independent auditor, and any steps taken to deal with any such issues.

Communicate directly with the independent auditors, and, if the Corporation maintains an internal audit function, the internal auditors.

97.   The Audit Committee also must: "review and discuss the following with management, the independent auditor, and, if the Corporation maintains an internal audit function, the internal auditor, as applicable:"

The scope and timing of the annual audit of the Corporation's financial statements

The Corporation's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Corporation's Form 10-K and the related press releases.

The results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements.

The quality and adequacy of the Corporation's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weakness in the design or operation of, and any material changes in, the Corporation's internal controls.

The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

Issues regarding accounting principles and financial statement presentation, including any significant changes in the Corporation's selection or application of accounting principles.

Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Corporation's financial statements.

Issues as to the adequacy of the Corporation's internal controls and any significant changes required or taken in the audit plan as a result of any material control deficiency.

Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

Any significant disagreements between management and the independent auditor.

98.    Other responsibilities set forth in the Audit Committee Charter include "review[ing] and discuss[ing] reports from the independent auditor concerning":

Critical accounting policies and practices to be used by the Corporation.

Alternative treatments of financial information within GAAP that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor if different from that used by management.

Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

The responsibilities, budget, and staffing of the Corporation's internal audit function.

Any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by

the engagement.

Other matters required to be communicated to the Audit Committee under generally accepted accounting standards and other legal or regulatory requirements.

99.     Pursuant to the "Audit Committee Report" section of the Audit Committee Charter, "[t]he Audit Committee shall prepare the report of the Audit Committee that SEC rules require to be included in the Corporation's annual proxy statement."

100.    The "Earnings Press Releases and Earnings Guidance" section of the Audit Committee Charter provides:

The Audit Committee shall review all earnings press releases before the Corporation publicly discloses this information, and discuss with management and the independent auditors corporate policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as corporate policies with respect to financial information and earnings guidance provided to the public, analysts and ratings agencies.

101.    The "Internal Controls" section of the Audit Committee Charter provides:

The Audit Committee shall review and discuss with management, the independent auditor, and, if the Corporation maintains an internal audit function, the internal auditor, the adequacy and effectiveness of the Corporation's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Corporation employees who have a significant role in the Corporation's internal controls. The Audit Committee shall also review and discuss with management and the independent auditors, disclosure relating to the Corporation's internal controls, the independent auditor's report on the Corporation's internal control over financial reporting (if applicable) and required management certifications to be included in or attached as exhibits to the Corporation's Annual Reports on Form 10-K or Form 10-F or Quarterly Reports on Form 10-Q, as applicable.

102.     The "Disclosure Controls and Procedures" section of the Audit Committee Charter

provides:

> The Audit Committee shall review and discuss the adequacy and
> effectiveness of the Corporation's disclosure controls and
> procedures. The Audit Committee must be satisfied that adequate
> procedures are in place for the review of the Corporation's public
> disclosure of financial information and must periodically assess the
> adequacy of those procedures.

103.     While the Audit Committee had clear responsibilities with respect to ensuring that

there were controls regarding the accuracy of the Company's financial disclosures and the

Company's communications with the public, it failed to fulfill these responsibilities. In fact, the

Audit Committee Defendants have gravely harmed the Company by taking part in the publishing

of false and misleading statements and/or omissions of material fact described herein.

**The False and Misleading Proxy Statements**

104.     In addition to the above false and misleading statements issued and/or caused to be

issued by the Individual Defendants, the Individual Defendants caused the Company to issue false

and misleading proxy statements filed on April 14, 2022 (the "**2022 Proxy**") and April 12, 2023

(the "**2023 Proxy**"). The 2022 Proxy and 2023 Proxy are collectively referred to herein as the

"Proxies."

105.     The 2022 Proxy recommended that shareholders vote to elect Defendants Bodaken,

Budig, Merz, Rubash, Snyderman, and Talwalkar to serve until the 2023 annual meeting. It also

recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's

independent registered public accounting firm for the 2022 Fiscal Year.

106.     The 2023 Proxy recommended that shareholders vote to elect Defendants

Blackford, Bodaken, Ling, Merz, Rubash, Snyderman, and Talwalkar until the 2024 annual

meeting. It also recommended shareholders to vote to ratify PricewaterhouseCoopers LLP as the

Company's independent registered public accounting firm for the 2022 Fiscal Year.

107.    The 2022 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> Our board of directors, as a whole, has responsibility for risk oversight, although the committees of our board of directors oversee and review risk areas that are particularly relevant to them. The risk oversight responsibility of our board of directors and its committees is supported by our management reporting processes, which are designed to provide visibility to our board of directors and to our personnel that are responsible for risk assessment and information about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include competitive, economic, operational, financial (accounting, credit, investment, liquidity and tax), legal, regulatory, cybersecurity, privacy, compliance and reputational risks.
>
> Our board of directors reviews strategic and operational risk in the context of discussions, question and answer sessions, and reports from the management team at each regular board meeting, as well as reports from other third-party experts from time to time, receives reports on all significant committee activities at each regular board meeting, and evaluates the risks inherent in significant transactions.
>
> Our Audit Committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management. Our Audit Committee reviews our major financial and enterprise risk exposures, including technology, privacy, cybersecurity and other information technology risks, among other things, discusses with management, our independent auditor and our internal auditor guidelines and policies with respect to risk assessment and risk management.

108.    The 2022 Proxy stated the following regarding the Company's Code of Business Conduct and Ethics:

> We have adopted a Code of Business Conduct and Ethics that applies to all of the members of our board of directors, officers and employees. Our Code of Business Conduct and Ethics is posted on the "Investor Relations" section of our website, which is located at https://investors.irhythmtech.com under "Governance Documents and Charters" in the "Governance" section of our website. We intend to satisfy the disclosure requirement under Item 5.05 of Form

8-K regarding amendment to, or waiver from, a provision of our
Code of Business Conduct and Ethics by posting such information
on our website at the address and location specified above.

109.    The 2023 Proxy contained similar provisions to the 2022 Proxy regarding risk
oversight and the Audit Committee's role in risk assessment and risk management.

110.    Defendants Blackford, Bodaken, Budig, King, Ling, Merz, Rubash, Snyderman,
and Talwalkar caused the Proxies to be false and misleading by failing to disclose that: (1) the risk
oversight functions of the Board and its committees were not being performed as described, as
evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the
Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the
Company's officers and directors, the Individual Defendants violated the Code of Conduct with
no consequences.

111.    Defendants Blackford, Bodaken, Budig, King, Ling, Merz, Rubash, Snyderman,
and Talwalkar caused the Proxies to be false and misleading and failed to disclose material facts
necessary to make the statement therein not false and misleading. Specifically, the Proxies failed
to disclose, *inter alia*, that: (i) as indicated in the FDA's Warning Letter, the Zio AT System was
"not cleared for" delivering near-real-time monitoring to high-risk patients; (ii) contrary to the
representations it made to investors, the Company did not comply with the FDA's marketing
regulations and prohibitions against the promotion of products for uncleared and unapproved uses;
(iii) the Zio AT monitoring system had failed to detect significant arrhythmias, leading to at least
two reported deaths; (iv) the Company had received a Warning Letter from the FDA regarding Zio
AT's deficiencies and the limitation of the product's approval to "long-term monitoring of
arrhythmia events for non-critical care patients where real-time monitoring is not needed"; (v) the
Zio AT "device is only able to transmit 100 patient-triggered and 500 automatically detected

arrythmia events" and "[t]hus, when the transmission limit is hit, the device can no longer be used for its intended purpose of transmitting patient ECG for reporting" ; (vi) the Company failed to "inform physician[s] of the existence of a transmission limit, when the transmission limit is reached, or include any information about the action a physician should take if the devise reached the transmission limit"; and (vii) the Company failed to inform patients "that a transmission limit exists, no notification to the patient when the transmission limit is reached, and no information provided to the patient about what to do when the transmission limit is reached[,]" leaving them unprotected. The Company failed to report the above-mentioned critical flaws in the Zio AT device, despite the fact that, according to the Warning Letter, the Company had knowledge of these flaws since at least 2017.

112.    As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders made uninformed decisions when voting to reelect the Individual Defendants as proposed in the Proxies.

## **BREACHES OF DUTIES**

113.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of iRhythm, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

114.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Zio AT device's capabilities. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to make, or by themselves making, improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused iRhythm substantial damage.

115.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving documents that omitted material information, making the improper statements detailed herein, and failing to properly oversee iRhythm's public statements and internal control function.

116.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of iRhythm, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result of this litigation, iRhythm has expended, and will continue to expend, significant sums of money.

## DAMAGES TO IRHYTHM

117.    As a direct and proximate result of the Individual Defendants' conduct, iRhythm has expended and will continue to expend significant sums of money.

118.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and money expended to comply with the DOJ subpoena.

119.    As a direct result of the Individual Defendants' conduct, iRhythm has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

121.    Plaintiff brings this action derivatively and for the benefit of iRhythm to redress injuries suffered and to be suffered because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of iRhythm, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

122.    iRhythm is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff is, and has been continuously at all relevant times, a stockholder of iRhythm. Plaintiff will adequately and fairly represent the interests of iRhythm in enforcing and prosecuting its rights and, to that end, has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

124.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

125.    A pre-suit demand on the Board of iRhythm is futile and, therefore, excused. At the time of filing this action, the Board consists of nine directors: defendants (i) Blackford, (ii) Bodaken, (iii) Ling, (iv) Merz, (v) Rubash, (vi) Snyderman, and (vii) Talwalkar (the "**Demand Defendants**"), as well as relevant non-parties (viii) Poul and (ix) Yoor. Plaintiff needs only to allege demand futility as to a majority of the Directors who are on the Board at the time this action is commenced.

126.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision

to bring the claims herein.

127.    Demand is excused as to all of the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they, knowingly or recklessly, made and/or caused the Company to make false and misleading statements and omissions of material facts regarding the capabilities of the Zio AT device. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Demand Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Demand upon them is futile and thus excused.

128.    Moreover, the Demand Defendants signed the 2021 10-K, 1Q23 10-Q, and 3Q22 10-Q, all of which contained false and materially misleading statements and/or omitted facts, as alleged herein. Accordingly, all of the Demand Defendants made the false and misleading statements contained in those financial statements, breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Demand Defendants is futile and therefore excused.

129.    Further, Defendant Blackford and the Audit Committee Defendants solicited the Proxies. The Proxies were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

**A.  The Board Faces a Substantial Likelihood of Liability**

130.    Demand is excused as to all the Demand Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability. In complete abdication of their fiduciary duties, the Demand Defendants either knowingly or recklessly participated in making and/or causing the Company to make materially false and misleading statements regarding the Company's Zio AT device. Specifically, the Demand Defendants knowingly or recklessly

made material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the investing public and supporting the artificially inflated price of iRhythm's securities. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Demand Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

131.    Specifically, the 2021 10-K was signed by Defendants Blackford, Bodaken, Budig, King, Ling, Merz, Rubash, Snyderman, and Talwalkar. The 1Q23 10-Q was signed by Defendant Blackford. The 3Q22 10-Q was signed by Defendant Blackford. All three of these financial statements contained false and misleading statements and/or omitted material facts, as alleged herein. Accordingly, all of the Demand Defendants made false and misleading statements, breached their fiduciary duties and face a substantial likelihood of liability. Thus, demand upon all of the Demand Defendants is futile and therefore excused.

132.    The Demand Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

133.    Additionally, the Demand Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

134.    Each of the Demand Defendants: 1) authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2021 10-K, 1Q23 10-Q, and 3Q22 10-Q, to be disseminated directly to the public and made available and distributed to

shareholders; 2) authorized and/or permitted the issuance of various false and misleading statements; and 3) are principal beneficiaries of the wrongdoing alleged herein. Thus, the Demand Defendants could not fairly and fully prosecute such a suit even if they instituted it.

135.    The Demand Defendants, as members of the Board, were and are subject to iRhythm's Code of Conduct. The Demand Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

**<ins>Additional Demand Futility Allegations</ins>**

136.    Demand is further excused as to Defendant Blackford. Defendant Blackford has served as the Company's CEO and as a director since October 2021. Therefore, as the Company concedes, he is not independent under the Nasdaq listing rules. As an employee of the Company, Blackford also derives substantially all of his income from his employment with the Company as stated above. Accordingly, Blackford could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.

137.    Moreover, as CEO, Blackford had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation and delivery of the Company's SEC filings alleged herein to be misleading and had the ability to have them corrected and/or prevent their release. Blackford knew or recklessly disregarded that adverse facts regarding the Company's Zio AT device had not been disclosed to, and were being hidden from, the public. Blackford signed the 2021 10-K, 1Q23

10-Q, and 3Q22 10-Q and thus personally issued the materially misleading statements and concealed the material facts described herein. Defendant Blackford is also a defendant in the Securities Class Action. As a result, Blackford faces a substantial likelihood of liability, would not be disinterested in a demand regarding his own wrongdoing, and demand is futile and excused as to him.

138.    Demand is further excused as to Defendant Bodaken. Defendant Bodaken has served as a Company director since July 2017.  The Company provides Defendant Bodaken with significant compensation for his role as stated above. As such, Defendant Bodaken cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Bodaken render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Bodaken breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Bodaken is futile and excused.

139.    Demand is further excused as to Defendant Ling. Defendant Ling has served as a Company director since November 2021. The Company provides Defendant Ling with significant compensation for her role as a director as stated above. As such, Defendant Ling cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Ling render her incapable of impartially considering a demand to

commence and vigorously prosecute this action. Further, as a trusted Company Director, she also consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Ling breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Ling is futile and excused.

140.    Demand is further excused as to Defendant Merz. Defendant Merz served as a Company director since April 2018. The Company provides Defendant Merz with significant compensation for her role as a director as stated above. As such, Defendant Merz cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Merz render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, she conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding her duties to protect corporate assets. As a result, Defendant Merz breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Merz is futile and excused.

141.    Demand is further excused as to Defendant Rubash. Defendant Rubash served as a Company director since March 2016. The Company provides Defendant Rubash with significant compensation for his role as a director as stated above. As such, Defendant Rubash cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Rubash render him incapable of impartially considering a demand

to commence and vigorously prosecute this action. Further, as a trusted Company Director, he conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding his duties to protect corporate assets. As a result, Defendant Rubash breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Rubash is futile and excused.

142.    Demand is further excused as to Defendant Snyderman. Defendant Snyderman served as a Company director since July 2017. The Company provides Defendant Snyderman with significant compensation for his role as a director as stated above. As such, Defendant Snyderman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Snyderman render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, he conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding his duties to protect corporate assets. As a result, Defendant Snyderman breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Snyderman is futile and excused.

143.    Demand is further excused as to Defendant Talwalkar. Defendant Talwalkar has served as Chair of the Board of Directors since October 2021. The Company provides Defendant Talwalkar with significant compensation for his role as a director as stated above.  As such, Defendant Talwalkar cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of

independence and the financial benefits received by Defendant Talwalkar render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company Director, he conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements, thus consciously disregarding his duties to protect corporate assets. As a result, Defendant Talwalkar breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Talwalkar is futile and excused.

144.    Furthermore, Defendants Budig, Rubash, Snyderman, and Talwalkar have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of iRhythm's financial statements. Specifically, the Audit Committee Charter provides that the Audit Committee is responsible for:

> [O]verseeing the Corporation's accounting and financial reporting processes and internal controls over financial reporting, as well as the audit and integrity of the Corporation's financial statements.
>
> * * *
>
> [Overseeing] the Corporation's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

145.    In their capacities as Audit Committee members, Defendants Budig, Rubash, Snyderman, and Talwalkar reviewed and approved the materially misleading statements and allowed them to be disseminated in iRhythm's SEC filings and other disclosures. Thus, Defendants Budig, Rubash, Snyderman, and Talwalkar breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

146.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.     Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness regarding these non-fraud claims.

148.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

151.    The false and misleading elements of the annual Proxies led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to iRhythm.

152.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

153.    Plaintiff, on behalf of iRhythm, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    The Individual Defendants, by virtue of their positions with iRhythm and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of iRhythm and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause iRhythm to engage in the illegal conduct and practices complained of herein.

156.    Plaintiff, on behalf of iRhythm, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

157.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRhythm's business and affairs as directors and/or officers of the Company.

159.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, and good faith, causing the Company to engage in the misconduct described herein.

160.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

161.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material facts referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

162.   The Individual Defendants engaged in a sustained a systemic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRhythm has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities litigation, severe damage to the share price of the Company's stock, and an increased cost of capital. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.    Plaintiff, on behalf of iRhythm, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of iRhythm.

167.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from iRhythm tied to the performance or artificially inflated valuation of iRhythm, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

168.    Plaintiff, as a stockholder and a representative of iRhythm, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

169.    Plaintiff, on behalf of iRhythm, has no adequate remedy at law.

### PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of iRhythm, and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.    Determining and awarding to iRhythm the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing iRhythm and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect iRhythm and its stockholders from a repeat of the damaging events described herein;

E.    Awarding iRhythm restitution from Individual Defendants;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

*Of Counsel:*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Daniel Tepper
Correy A. Suk
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
(212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

**ASHBY & GEDDES, P.A.**

*/s/ Tiffany Geyer Lydon*

_____
Stephen E. Jenkins (#2152)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888
sjenkins@ashbygeddes.com
tlydon@ashbygeddes.com

*Attorneys for Plaintiff*

Dated: May 17, 2024